IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED
00 FEB -8 PM 12:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| LINDA HALL, | ) |
| Plaintiffs, | ) |
| vs. | ) Case No. CV-98-TMP-2509-S |
| CARETENDERS, INC., | ) |
| Defendants | ) |

ENTERED
FEB 0 8 2000

MEMORANDUM OF OPINION

This action is before the court on the motion for summary judgment filed by the defendant on December 1, 1999. The parties have briefed the motion and have submitted evidentiary materials in support of and in opposition to it. The parties have consented to the exercise of full dispositive jurisdiction by the undersigned magistrate judge, pursuant to 28 U.S.C. § 636(c).

### Summary Judgment Standards

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment

"always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)(quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, she may not merely rest

2

on her pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's

Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## Undisputed Facts

Applying these standards, the following facts appear to be undisputed, or, if disputed, are taken in a light most favorable to the plaintiff. Plaintiff became a licensed practical nurse (LPN) in 1982, working for various hospitals, including UAB, Brookwood, Lloyd Nolan, and Bessemer Carraway. In 1994, she earned registered nurse (RN) status. In October 1996, she was hired by defendant as a full-time RN/case manager. Defendant supplied home health care to patients who were not ill enough to be hospitalized, yet so ill that they were home-bound and in need of medical supervision. Plaintiff's job duties required making at least thirty home visits per week to such home-bound patients, monitoring their conditions, making sure their medical treatments was being followed, and maintaining the appropriate medical charts and records of such visits. From the beginning of her employment, plaintiff understood that she would be required to use her own automobile to travel to the homes of patients assigned to her.

Plaintiff worked uneventfully until May 1997 when she began to experience lightheadedness, and on May 16, 1997, she fainted in the home of a patient. Although she was revived by a relative of the patient, she was taken by ambulance to Brookwood Medical Center. Neither the emergency room physician nor plaintiff's primary

5

physician could diagnose the cause of the fainting spell. Plaintiff remained off work for twelve days, until May 28, 1997. On the very day she returned to work, plaintiff suffered another fainting spell and remained off work following this episode until she was released by her physician on June 5, 1997. The doctor's release, however, restricted her to office work only with no driving. Because she could not drive and, therefore, could not perform her in-home nursing visits, plaintiff remained off work until June 26, 1997, when her doctor released her to drive again.

Plaintiff continued to suffer fainting spells, one occurring at work on July 8, 1997, and another at her doctor's office on July 12, 1997. Except for one day, plaintiff remained off work from July 8 to July 16, 1997, and was released to perform full duties (including driving) on July 18, 1997. On July 17, 1997, plaintiff was reminded by her supervisor that Caretenders' employment policy allowed an employee only six "occurrences" during any twelve month period. An "occurrence" was any day or group of days missed from work. At that point, plaintiff already had five "occurrences" within the prior six months.

On August 12, 1997, plaintiff injured her wrist while assisting a patient. While her arm was in a splint, she was assigned to perform supervisory visits, which are in-home

6

interviews with patients concerning the quality of care they receive from defendant's home health nurses. During this time, plaintiff was given a home health aide to assist her write the answers given during the interviews.

On August 28, 1997, plaintiff suffered yet another fainting spell. She was not released by her physician to perform full duties (including driving) until September 4, 1997. She was informed that her position as a home health RN had been terminated and that she was being transferred to PRN status. PRN status meant that plaintiff would be called to work on an "as needed" basis.

On September 27, 1997, plaintiff's condition was diagnosed as narcolepsy/cataplexy.[1] Despite treatment, she continued to suffer unpredictable fainting spells until the summer of 1998. The next day, September 28, 1997, plaintiff filed a charge of discrimination against defendant, alleging that she was the victim of discrimination due to a disability. She was given a right to sue letter on August 11, 1998.

---

[1] Narcolepsy is a physical condition causing a person to lapse suddenly and unpredictably into sleep. Cataplexy is sudden temporary paralysis or loss of consciousness. Defendant disputes this diagnosis, arguing that there is evidence that plaintiff has been diagnosed with Munchausen syndrome, a psychological condition causing a person to feign illness to gain sympathy. Of course, the court takes the plaintiff's view of the evidence for purposes of summary judgment.

During the Fall of 1997, defendant's patient census count began to decline to the point that by January 1998, more than one-third of the nursing staff had been laid-off due to lack of work. Paradoxically, during September and October 1997, defendant hired two new full-time nurses.

From September 1997 to April 1998, plaintiff called frequently for part-time PRN assignments, but her supervisor had determined not to assign any work to her. By November 7, 1997, however, defendant terminated plaintiff's employment due to plaintiff's failure to update her personnel file with certain information and documentation required by Medicare. Plaintiff never received notice from Caretenders of the need to update the file. Defendant's records were audited by the Alabama Department of Health, Division of Health Care Facilities, on September 11 and November 14, 1997.

## Discussion

Plaintiff filed suit in this court on October 2, 1998, alleging a cause of action under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. She alleged that she was a qualified individual with a disability and that the defendant violated the Act by refusing to provide a reasonable accommodation

8

for her disability and by terminating her employment because of it.[2] Although left unclear by the complaint, plaintiff's brief in opposition to summary judgment makes plain that she contends that she was terminated for a "perceived disability" under 42 U.S.C. § 12102(2)(C).[3] The court, therefore, will limit its analysis to the issues of whether plaintiff was "regarded as having...an impairment" for which she was terminated and whether the defendant failed to reasonably accommodate the "perceived" disability.

It is a violation of the ADA not only to discriminate against a qualified individual who is in fact disabled, but also against one with a record of a disability or who is "regarded" as suffering from a disabling impairment. The term "disability" is defined by the Act to include individuals "being regarded as having [a physical or mental impairment that substantially limits one or more

---

[2] The court does not read the complaint to allege a claim of retaliation for any action taken after the filing of her charge of discrimination on September 28, 1997. This is confirmed implicitly by the fact that her brief in opposition to summary judgment does not refer to any claim of retaliation.
   It is also not clear which "termination" she complains of. She lost her full-time employment upon being transferred to PRN status on September 4, 1997. Her final termination apparently occurred on November 7, 1997, but she filed her EEOC charge on September 28, 1997, apparently in response to the September 4 action.

[3] See Plaintiff's Brief, pp. 7-8.

of the major life activities of such individual]." 42 U.S.C. § 12102(2)(C). Claims of discrimination based on this standard have been called "perceived disability" discrimination claims. See, e.g., Witter v. Delta Airlines, Inc., 138 F.3d 1366, 1369 (11th Cir. 1998); Duda v. Board of Education of Franklin Park Public School District No. 84, 1997 U.S. Dist. LEXIS 7097 (N.D. Ill., 1997). Like actual disabilities, to qualify for protection under the Act, the "perceived" disability must be regarded by the employer as one that "substantially limits one or more of the major life activities" of the employee. It is not enough that the employer merely perceives the employee to have an impairment; the employer must perceive, correctly or incorrectly, that the impairment substantially limits the employee in one or more of his major life activities.

In this case, plaintiff argues that her narcolesy/cataplexy was regarded by her employer as a disability that substantially limited a major life activity. Because she could not safely drive to the homes of her patients, plaintiff contends that defendant regarded her as substantially limited in her ability to work in the field of home health nursing.[4]

---

[4] The court does not understand plaintiff to argue that driving itself is a "major life activity" of the sort

10

It is not enough, however, to show that the employer may have regarded the impairment as limiting the employee's ability to perform a specific job or a narrow class of jobs. Rather, to meet the definition of disability found in the Act, the "perceived" impairment must be regarded by the employer as restricting the employee's ability to perform a broad range of jobs. As the Eleventh Circuit has explained:

> Therefore, to establish that he has a "disability" under the "regarded as" prong of § 12102(2), [the employee] must produce evidence showing that [the employer] regarded him as being significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes.

---

contemplated by the Act. Rather, she seems to contend that she cannot work as a home health nurse, and that the substantial limitation on that ability to work is the "major life activity" being limited by her perceived disability.
   In any event, driving is not a "major life activity" within the meaning of those terms in the Act. See Wyland b. Boddie-Noell Enterprises, 165 F.3d 913, 1998 WL 795173 (4th Cir. 1998); Colwell v. Suffolk County Police Dept., 158 F.3d 635, 643 (2nd Cir. 1998) cert. denied 119 S.Ct. 1253 (1999). In Bragdon v. Abbott, 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed. 2d 540 (1998), the Supreme Court expressed the view that the use of the word "major" connoted that the life activity had to be comparatively important, like walking, seeing, hearing, or caring for oneself. Driving is a convenience, but not sufficiently important to make it a "major" life activity.

11

<u>Witter v. Delta Airlines, Inc.</u>, 138 F.3d 1366, 1370 (11th Cir. 1998); <u>see also</u> <u>Pritchard v. Southern Company Services</u>, 92 F.3d 1130, 1133 (11th Cir. 1996). In <u>Witter</u>, the court of appeals rejected that plaintiff's claim under the "perceived disability" standard, even though he was regarded as being unable to perform his job as an airline pilot, because he was not regarded by his employer as being unable to perform other jobs requiring the same level of education, training, and skill. Thus, loss of the ability to perform a *particular* job does not mean that the impairment substantially limits a person's ability to work.

The class of jobs consisting of visiting home-health nurses is too narrow a class to determine that the plaintiff's ability to perform the major life activity of work is substantially limited, or perceived by her employer to be substantially limited. Even if defendant regarded her as disabled to perform that job or class of jobs because she was incapable of driving safely, there is no evidence that her employer believed she was incapable of performing many other types of nursing jobs. Indeed, there are many types of jobs available for someone with the training, education, skill, and experience possessed by the plaintiff in the field of nursing which do not require driving a vehicle. Nursing jobs in hospitals,

12

nursing homes, and physicians' offices do not ordinarily entail driving as an essential function of the job.

Plaintiff asserts that the fact that Caretenders never offered her any temporary or part-time work after transferring her to PRN status is evidence that defendant regarded her as unable to perform the entire broad class of nursing duties. To carry her burden of proof on this point,[5] plaintiff has offered only the Fortson affidavit, which defendant has moved to strike.[6]  In substance, Jennifer Fortson's affidavit states that she overheard Debra Parker tell Caretenders employees that, if plaintiff called, she should be informed that there was no work available for her, and that during September and October 1997, two new nurses were hired.

This testimony, taken as true, fails to establish even a fact question about whether there was a discriminatory animus behind the instruction to employees to tell plaintiff that no work was

---

[5] This argument is pertinent to whether plaintiff suffered an adverse job action, that is, being rejected for PRN work. As such, the burden of proof is on her to establish this as part of her *prima facie* showing.

[6] While there are portions of the Fortson affidavit that clearly are not based on her personal knowledge, the parts relevant to this issue appear to be admissible. The motion to strike, therefore, is DENIED. Although admissible, the affidavit still is insufficient to create a fact issue precluding summary judgment, for the reasons explained in the text.

available. The affidavit fails show that, indeed, work was available for plaintiff as a PRN nurse. Defendant has offered undisputed testimony that by the Fall of 1997, defendant's census of patients was declining. The Fortson affidavit shed no light on whether plaintiff was denied work for discriminatory reasons or simply because there was no work due to a declining workload. Further, even if two new, full-time nurses were hired, this says nothing about the availability of work for a nurse in PRN status. For legitimate business reasons, Caretenders may have wanted to hire full-time staff rather than rely on temporary PRN nurses, particularly in the area of home-health visits where plaintiff was of no help.[7] In short, the Fortson affidavit simply fails to create an issue of fact regarding the *reasons* why plaintiff was denied work and new nurses were hired, leaving the fact-finder to speculate that the reason *may* have been discriminatory or, just as likely, the product of legitimate business decisions. Speculation

---

[7] Hiring two new nurses was not inconsistent with defendant's evidence of a declining patient workload. The Fortson affidavit says nothing about turnover of staff. It is entirely possible that two new nurses were hired to replace nurses who left employment and who were still needed despite the shrinking patient workload. The Fortson affidavit fails to dispute the evidence of declining patient census or to show that the new hires were due to increased work demand. Again, we are simply left to speculate about these circumstances.

is not a sufficient evidentiary basis for avoiding summary judgment.

Thus, there is no evidence that defendant *regarded* plaintiff's impairment as so substantially limiting as to amount to a real or "perceived" disability. While Caretenders believed that she could not perform the job of visiting home-health nurse because she could not drive safely due to her illness, there is no evidence that defendant regarded her as unable to work as a nurse in other, non-driving settings. Because defendant did not regard her as substantially limited in her ability to work, she cannot come within the "perceived disability" theory of discrimination.

Plaintiff also argues that defendant failed to reasonably accommodate her disability. While not clearly articulated in the pleadings or plaintiff's summary judgment opposition, plaintiff appears to contend that she should have been transferred to a non-driving job as an accommodation. She has failed however, to refute defendant's contention that there were no jobs for full-time home-health nurses that did not involve driving. The position plaintiff held, and those of all other similar nurses, required them to travel to the home of the patients and to document the nursing services provided. Preparing documentation took no more than two or three hours each workday and, therefore, could not be regarded

15

as full-time employment. Other managerial positions that became available were not mere transfers, but would have involved substantial promotions. Accommodation under the ADA does not require that a plaintiff be *promoted* to a job he or she can perform.

Finally, plaintiff cannot meet the threshold for even demanding accommodation. Accommodation is something available to an employee who is otherwise a "qualified individual." The Act defines one form of discrimination as failing to "make reasonable accommodations to the known physical or mental limitations of an *otherwise qualified individual with a disability* ...." 42 U.S.C. § 12112(b)(5)(A). Plaintiff here is not a qualified individual with a disability. As explained extensively above, her narcolepsy/cataplexy interferes with her ability to drive safely and, therefore, work as a visiting home-health nurse. It does not, however, preclude her from working generally as a nurse in many other settings. While it may prevent her from working in a particular job or a narrow class of home-health nursing jobs, it does not stop her from working as a nurse. Because her condition does not substantially limit a *major* life activity like work, she is not disabled and has no right to seek accommodation. Thus, even

16

if defendant failed to accommodate her with a transfer, it did not violate the ADA because plaintiff does not come within the statutory definition of a person with a disability.

### Conclusion

Based on the undisputed facts and the legal considerations explained above, the defendant's motion for summary judgment will be GRANTED by separate order, and this action DISMISSED WITH PREJUDICE.

DONE this 8th day of February, 2000.

T. MICHAEL PUTNAM
CHIEF MAGISTRATE JUDGE

17